ASHUELOT SAVINGS BANK *v.* ALBEE & a.

A contract is not invalidated by a false and fraudulent representation inducing it, if it does not appear that the representation was a substantial or material part of the inducement, or that without it the contract would not have been made.

A contract induced by a false statement is not thereby invalidated without privity of representation.

Such privity does not exist between a savings-bank and its treasurer's sureties who are induced to sign his official bond by oral statements of the bank's soundness made by its trustees, but not made to the sureties, or with any expectation of their coming to their knowledge, or with a belief or reason to believe they would induce any one to become a surety.

The statute requiring the reports of the examining committee of a savings-bank to be published (G. L., c. 170, s. 2) is not a provision for aiding the treasurer of the bank in obtaining sureties on his official bond : and the requirement of publication does not establish, between the bank and the public, such a privity of representation as to authorize any one to become a surety of the treasurer on the faith of a statement in the published reports that the examinations were thorough.

DEBT, on the official bond of the plaintiff's treasurer. Facts found by a referee. Albee being annually elected treasurer of the plaintiff bank from 1865 to 1881, gave a bond each year. The bond in suit was given in 1877. A by-law required all deposits received by him to be forthwith deposited by him in the Winchester Bank in the plaintiffs' name. Various sums of the plaintiffs' money were embezzled by him each year, from 1866 or 1867 to 1881. January 1, 1877, he had embezzled more than $40,000. No defalcation was discovered until 1881. For concealment, he made false entries on the plaintiffs' books, crediting himself with fictitious payments to depositors, borrowers, and the Winchester Bank. By a careful examination of the books, made by a person having ordinary knowledge of book-keeping, his false entries and embezzlements would have been discovered. A by-law required that two members of the board of trustees should examine the treasurer's books on the first Monday of each month, and report in writing, at the next meeting of the board, the amounts of deposits received and withdrawn, and the general condition of the funds, and should state particularly in the report whether they found the account of the treasurer satisfactory. The duty imposed upon the trustees by this by-law was never performed.

The trustees caused an examination of the bank to be made by a committee of three of their number, in January and July of each year. By reason of negligence in these examinations, the committee, not familiar with the book-keeping in use, and misled by their confidence in the treasurer, did not discover any default. Upon each report of an examination, they made oath that they had made a thorough examination of the affairs of the bank, and that the report was true according to their best knowledge and belief. They believed their examinations were thorough, and that the standing of the bank was as represented in their reports. According to these reports the bank seemed to be solvent, and gradually accumulating a surplus and a guaranty fund.

The president and trustees of the bank believed it to be sound, and so represented it whenever they had occasion to speak of it. They had no suspicion of embezzlement until it was discovered in 1881.

The sureties signed the treasurer's bond at his request. They had confidence in him, and in the other officers of the bank, and their management of its affairs. They knew that the president and some of the trustees recommended the bank as sound; and they saw the published reports. All these things together induced them to sign the bond.

*B. Wadleigh*, for the sureties. The sureties are not liable upon the bond because they were induced to sign it by the false representations of the trustees that they had made a thorough examination of the bank, which showed that it was sound, and that its affairs were honestly and prudently administered. The general principle governing this class of cases is well settled. It is that a surety, who executes a bond on a misrepresentation by the obligee of a material fact, is discharged. Brandt Sur., *s.* 348; *Blush* v. *Brown*, 3 Giff. 450; *Willis* v. *Willis*, 17 Sim. 218. If it be said that fraud must exist in order to invalidate the obligation of a surety, it must be remembered that actual fraud is not required. If one has actual knowledge of past defalcation, mere failure to communicate is a fraud in law. *Sooy* v. *State*, 10 Vr. 135. A concealment, to vitiate a bond, need not be wilful and intentional, or with a view to the advantage of the person concealing. *Railton* v. *Mathews*, 10 Cl. & Fin. 935; *Phillips* v. *Foxall*, L. R. 7 Q. B. 666; Bayl. Sur. 296; Cool. Torts 482. A fraud may be perpetrated as well by an assertion of facts that do not exist, ignorantly made by one whom the person acting upon the assertion has the right to suppose has used reasonable diligence to inform himself, as by a concealment of facts known to exist, which in equity and good conscience ought to be made known. Bayl. Sur. 215; Thomp. Liab. Off. 520, 521, citing *Graves* v. *Lebanon Bank, infra.*

In *Graves* v. *Lebanon National Bank*, 10 Bush. 23, the facts were very like those in the present case. The cashier, never having furnished a bond, had embezzled. This fact was not known to the directory, but might have been discovered by the use of slight diligence. The directors innocently published a statement in a newspaper, representing that the bank was in a good financial condition, and tending to show that the affairs of the bank were prudently and honestly administered. Afterwards, persons who had seen the published statements became sureties on the cashier's bond, and were sought to be held liable for subsequent embezzlements. The court held that the sureties were discharged. While nothing short of actual fraud would have released them after the contract of suretyship was entered into, equitable fraud, — *i. e.*, the failure to

communicate material facts which the directors might have known by the exercise of reasonable diligence, and which, therefore, they ought to have known,—was sufficient to discharge the sureties if the neglect occurred before they became such. *Lee* v. *Jones*, 17 C. B. N. S. 482, applies the doctrine to facts much less favorable to the surety than are those in the present case. There the plaintiffs' agent, who sold the goods delivered to him on commission, had failed to pay over all that the plaintiffs were entitled to out of the receipts, and so he had become indebted to them. They then told him he must get some one to guarantee prompt payments by him in the future. At the agent's request, and without having seen or had any negotiations with the plaintiffs, the defendant agreed to become surety. The plaintiffs, being notified of the fact by the principal, drew up and sent a contract to the defendant, which he signed. The instrument set forth what had been the course of dealing between the parties and what it would continue to be, but omitted to state the fact that the agent was then indebted to them. *Held*, that this omission was evidence for the jury in support of a plea that the defendant was induced to enter into the contract by the fraudulent representations of the plaintiffs. Two judges *(Pollock* and *Bramwell)* dissented, putting their opinions on the ground that there was no representation whatever by the plaintiffs to the defendant; but it is clear that neither regarded actual fraud necessary in order to invalidate the contract. *Bramwell*, J., says,—"To constitute fraud there must be, first, the assertion of something false; or, secondly, the suppression of something true, where there is a duty or profession of stating everything material."

A very exhaustive examination of all the authorities discovers but one case which seems to sustain the plaintiff's claim; that is *Detroit* v. *Webber*, 26 Mich. 384. The defendants there were sureties for the city treasurer. Two years previous to date of bond he had held office, and during that time was a defaulter. The city ordinance required that the committee on ways and means should examine books at least once a month, and report; and if any irregularity was found, to notify bondsmen. The ordinance was not complied with, and no report was made. But before the bond was given to the city, the city controller represented to the defendants that it was the practice of the committee to make such investigation and report; that they had theretofore been made, and that they should regularly be made in future. Of the majority of the court, *Campbell*, J., seems to put the decision on the ground of public policy alone. He refers to the doctrine that "by falsely concealing from the sureties, who are invited to become responsible, the fact that an agent was dishonest and already in default, they are discharged;" and adds, "But however that doctrine may affect private persons who ask security, it can have no application to public agents." He also intimates that the controller's representations as to past practices (which were a matter of record in the city council) were

beyond the scope of the controller's authority as an agent of the city; and *Christiancy*, C. J., puts his decision on that ground— that "sureties could not be discharged unless it was clearly a part of the controller's official duty to give correct information as to the examination of the treasurer's accounts by the investigating committee." In the present case, however, the statements made by the trustees were made in the course of their official duty, and so these defendants had a right to rely upon them. Even the opinions of the majority of the court, therefore, in *Detroit* v. *Webber*, sustain the view now contended for. And in that case, Judge *Cooley* delivered a powerful dissenting opinion, which seems to us more weighty than the majority opinion. He says,—"I think it immaterial that the representations were made in good faith." "Had the representation of the controller been fraudulently made, there is no question, I suppose, that the sureties might avoid their obligation. The loss should fall on the city, and not on the sureties."

*Tapley* v. *Martin*, 116 Mass. 275, *State* v. *Bates*, 36 Vt. 387, and *Franklin Bank* v. *Stevens*, 39 Me. 532, are not in point, as in them there were no representations, by way of published statements or otherwise, that a thorough examination had been made, and that the affairs of the obligee, managed by the principal to the bond, were properly administered; and so there was nothing in the conduct of the obligees which could have operated as an inducement for the sureties to sign.

It was a legal fraud for these trustees, who were presumed in their official position to have a personal acquaintance with the character of the business management of the bank, to represent affirmatively, by means of the published sworn statements and otherwise, that the bank was solvent and in good condition, for the sureties, and everybody who saw these public representations, had a right to be influenced in their dealings with the bank by the supposition that the trustees had done their duty, and that nothing had been done by the treasurer or any other official to impair the sound condition of the bank, because a presumably careful examination by a committee of the trustees (and an examination stated in each of their own affidavits to have been made thoroughly) had failed to discover any irregularity or dishonesty in the treasurer's management. The trustees' belief that their examinations were thorough is immaterial. Even in actions on the case for deceit or false representations, there is a large class of cases where the question of belief or good faith on the part of the wrong-doer is disregarded; and there can hardly be any doubt that these trustees would be answerable to the sureties in an action at law for false representations. It is not necessary, of course, to show that such an action would lie upon the facts in this case in order to sustain the defence now urged; but whenever an action in the nature of deceit could be maintained by defrauded sureties, the defence in a suit upon their bond would be good. "If a man, having no knowl-

edge whatever upon the subject, takes upon himself to represent a certain state of facts to exist, he does so at his peril; and if it be done either with a view to secure some benefit to himself, or to deceive a third person, he is in law guilty of a fraud.     *     *     * Although the person making the representation may have no knowledge of its falsehood, the representation may nevertheless have been fraudulently made." *Maule*, J., in *Evans* v. *Edmonds*, 17 Jur. 883. In *Jenkins* v. *Hutchinson*, 13 Q. B. 748, Mr. Justice *Earle* says,—" A declaration is not deemed fraudulent which the speaker believes true. But if he is aware that he has only an opinion, yet represents that opinion as knowledge, he cannot be said to believe his representation true." See Cool. Torts 493–501, for American cases. *Smith's Case*, 2 Ch. App. 604, illustrates the strict accountability to which the English law holds directors and others for the truth of what they represent in their prospectuses. One who had been led to subscribe for mining stock upon the strength of a flattering prospectus, applied to the court to have his name removed from the list of subscribers. The directors had issued the prospectus on the faith of the representations of the vendor of the mines, and without knowing of their untruth. It was held, however, that the plaintiff was entitled to the remedy applied for. Lord *Cairnes* said,—" The representation in the prospectus being untrue in point of fact, it seems to me perfectly immaterial whether the directors, when they made it, believed it to be true or did not believe it to be true. That might be material with reference to proceedings of a different kind instituted against the directors with a view to obtain damages from them personally, but for the purpose of this investigation I think it must be taken that they repeated the statement as one the truth of which they were content to vouch for. If they had been content to say, ' We ourselves know nothing about the state of the mine, but we have been told it is a very valuable mine, largely worked at present,' and if they had in point of fact been so told, no person could have complained of the prospectus as calculated to mislead ; but in place of repeating as hearsay what they had been told, they affirm it as a positive fact, and apparently, according to the terms of the prospectus, as a fact within their own knowledge."

The sureties signed the bond at Albee's request; they had confidence in him and in the other officers of the bank, and in their management of its affairs; they knew that the president and some of the trustees recommended the bank as sound, and they saw the published statements. All these things together induced them to sign the bond. It is obvious that the inducement need not have been the sole cause of the sureties' signing, for it is hardly possible to conceive of a case where there would be only one cause operating upon the surety's mind. The facts surrounding such a transaction as the signing of a treasurer's bond are always more or less complex, and the signer always gives credit to more than one

circumstance before he is willing to assume important financial responsibilities. If, then, it were necessary for a surety, in order to exempt himself from liability, to show that the obligee's representations, false upon a material point, and made under such circumstances as equitably to charge the obligee with fraud in making them, constituted the sole motive and inducement of his signing the bond, he would inevitably be bound by the act, and that principle of the law of suretyship above stated could have no existence.

In an action at law for a false representation in writing as to the circumstances of a third person, whereby the plaintiff was induced to give credit to such third person, the plaintiff may recover, although he may have been in part influenced by subsequent oral statements by the defendant. It is enough for the plaintiff to show that he was substantially induced by the written representation. *Tatton* v. *Wade*, 18 C. B. 371. In that case, *Pollock*, C. B., said,—" If a person does an act for which he is by law responsible, he is liable to be sued for the mischief he has occasioned; and it is no answer to say that something else contributed to it (not being the consequence of the defendant himself)." And *Bramwell*, J., remarked,—" The real question is—though I must confess I entertained a little doubt—whether there is a continuing contributory cause; whether the plaintiff acted upon the written representation. If there was, all concurs that is essential to the maintenance of the action." Cooley gives the rule : " It is not essential that they [false representations] should have formed the sole inducement to a contract; it is enough that they formed a material inducement." Torts 502. Chief-Justice *Shaw*, in *Matthews* v. *Bliss*, 22 Pick. 48, 53, held it an error to instruct the jury that a false representation to be actionable must have been the predominant motive (influencing a sale), and said,—" If the false and fraudulent representation was a motive at all inducing to the act, if it was one of several motives acting together and by their combined force producing the result, it should have been left to the jury so to find it." *Safford* v. *Grout*, 120 Mass. 20, is an express authority upon this point, and in accord with the preceding case. See, also, *Clarke* v. *Dickson*, 6 C. B. N. S. 453, and *Addington* v. *Allen*, 11 Wend. 375. Any fact or circumstance supposed by the surety at the time he signed to be true, is in law the cause of his action, if a knowledge of the contrary to what that fact or circumstance affirms would have prevented him from signing. In this case, the sureties relying in part, as the referee finds, upon the supposition that the published statements had been found true after a thorough investigation, when if the trustees had done their duty the real condition of the bank would have been revealed and the sureties' " confidence in Albee " have been destroyed, it is clear that they were induced by the false representations in question to assume a liability to which they cannot lawfully be held.

*Batchelder & Faulkner,* for the plaintiffs. Negligence in examining the books of the treasurer by the officers of the bank, either before or after the execution of the bond, is no defence for the sureties. *Bank* v. *Root,* 2 Met. 522; *Bank* v. *Brownell,* 9 R. I. 168; *Trent Navigation Co.* v. *Harley,* 10 East 34; *United States* v. *Kirkpatrick,* 9 Wheat. 721; *Association* v. *Price,* 16 Fla. 204. And the same is true although a slight examination of the books would have revealed defalcations, and the officers of the bank were guilty of gross negligence in making their examinations. *Talpey* v. *Martin,* 116 Mass. 275; *Franklin Bank* v. *Stevens,* 39 Me. 532. And for two strong grounds for this rule, viz., that the duty to examine forms no part of the contract, and that the negligence of the officers of a corporation is not negligence on the part of the corporation, see *McKecknie* v. *Ward,* 58 N. Y. 541; *Bank* v. *Root,* 2 Met. 541; *Ins. Co.* v. *Simmons,* 131 Mass. 86. The doctrine, that the failure of the officers of a bank to detect defalcations of their cashier or treasurer discharges the sureties on his bond, would defeat the sole purpose of requiring a bond. If persons occupying that position of trust are to be so watched and guarded that no wrong can be done, or if done be detected at once, there would be no occasion for a bond. The bond is not given to the trustees, or for their benefit, but to the bank for the benefit and protection of the depositors whose property is in the hands of the man for whose honesty the sureties pledge themselves and their property.

The party seeking to avoid his contract must prove either that he was induced to sign by relying upon a false statement of material facts which was known to the other party to be false when made, or that the other party, at the time of signing, withheld from him knowledge of facts material for him to know and which he did not have equal means of knowing. *Hoitt* v. *Holcomb,* 23 N. H. 535; *Jones* v. *Emery,* 40 N. H. 348; *Pettigrew* v. *Chellis,* 41 N. H. 95. And any representations, whether known to be false or not known to be true, in order to be available as a defence, must have been such as the surety has a right to rely upon, and have been made at such time and in such connection that they related in some way to the contract, and have been made with the knowledge that they would or might have some effect upon the contracting party. A representation as to the character or quality of a chattel made by A to B, in a conversation which had no connection with a sale of the chattel to B, cannot be set up by C as a defence to a sale of that chattel to him which was brought about by subsequent negotiations between A and C in which no representations or allusions to the former conversation were made. Statements of material facts made by the officers to these sureties in conversations which did not in some way relate to the contract, expressions of their opinion (and the published statements were nothing but expressions of opinions which they honestly held), and statements to third parties unconnected with the contract, were not such representations as

will avoid the contract. They were not statements upon which the sureties had a right to rely.

No claim is made, and no fact found by the referee tends to show, that the officers made any wilfully false representations, or withheld the knowledge of any material facts from these sureties; and negligence, however gross, in discovering material facts, cannot be considered constructive fraud, and cannot avail as a defence. The published reports were not statements that Albee was honest, but statements of the bank's condition, which they believed to be true; not made to the sureties, or for their information, or for the information of those who should afterwards become sureties. It was no part of the contract of the sureties with the bank that any examinations should be made, or that statements of the bank's condition should be published; but the reports were published from time to time, as the statute required, for the information of the depositors, without regard to whether Albee was about to furnish a bond or not. The verbal statements were such as the officers of any bank would make when inquired of by people in general conversation, or casually when met on the street, and were but the expression of an opinion which they entertained as to the soundness of the bank. And there is no pretence that any of the officers ever made any of these statements to any of these defendants in conversations which related to their having become sureties, or their becoming sureties in the future. If fact, the officers of the bank took no part in procuring the sureties, and only knew whom they were to be when Albee presented his bond for acceptance. Nor does it appear that Albee himself made any representations as to the condition of the bank to his sureties, or that they ever inquired of him, or of any of the officers, when they had it in mind to become sureties, or after they had signed the bond. The sureties might with equal force claim to be discharged from their obligations because the bank commissioners had not discovered the defalcation when they examined the bank year after year, or because they had read the commissioners' published report. If making such statements will discharge sureties, no reader of the *New Hampshire Sentinel*, or the published reports of the bank commissioners, would have been eligible as one of Albee's sureties, and hardly one of the bonds now held by our savings-banks furnishes the slightest protection to the depositors against the defalcation of a dishonest treasurer.

DOE, C. J. No defence being suggested in behalf of the treasurer, his sureties may be regarded, in the present inquiry, as the only defendants. Their defence is, not that they were discharged by the negligence of the examining committee, but that they were induced to sign the bond by representations false in fact and fraudulent in law. They were induced to sign the bond by the combined influence of the treasurer's request; their confidence in him and in the other officers of the bank, and their management of its

affairs; their knowledge that some of the trustees represented the bank to be sound when they had occasion to speak of it; and the published reports of the examinations made by the committee of the trustees.   One defect in this defence is, that it does not appear that the alleged representations (contained in the published reports of the committee's examinations, and in the oral commendations of the soundness of the bank) formed a substantial or material part of the inducement (Cool., Torts 502), or that the defendants would not have signed the bond if these representations had not come to their knowledge.   *Safford* v. *Grout*, 120 Mass. 20, 24, 25.

Some of the trustees, when they had occasion to speak of the condition of the bank, were accustomed to represent it as sound.   It does not appear that these oral recommendations were intended or understood to be anything more than expressions of opinion, or were the joint or concerted action of the board or any of its members, or were the action of a quorum or any number authorized to bind the plaintiffs, or were intended or understood to be given by any one in his official capacity, or that, on any ground, they can be considered as representations made by the plaintiffs.   And if they were statements of the fact of soundness, and not mere expressions of opinion, and if, in contemplation of law, they were made by the plaintiffs, they are immaterial because it does not appear that they were made to the defendants, or with any expectation of their coming to the defendants' knowledge, or with any belief or reason to believe they would induce any one to become a surety of the treasurer.   The necessary privity is not shown.   Cool. Torts 493.

The law required that a thorough examination of the plaintiffs' affairs should be made by the trustees, or by a committee of trustees, once in every six months; that a report of such examination, signed by a committee of the trustees, should be returned to the bank commissioners; that a copy of the report should be published by the plaintiffs in a newspaper; and that proper blanks for these examinations should be furnished to the plaintiffs by the bank commissioners.   G. L., c. 170, ss. 2, 3, 4.   These duties were performed with an exception by which the examinations, reports, and publications were rendered useless.   The committee erroneously believed their examinations were thorough.   By their superficial inspection the annual defalcation was not discovered.   They acted in good faith, and according to their understanding of their duty; but, as frequently happens in such business, confidence in the treasurer, and lack of special detective skill, made the examiners incompetent for the task assigned them.   The case is not an exceptional instance, but the operation of a general system.   Many trust funds, private and public, need the service (obtainable for an adequate compensation, under the law of demand and supply) of investigators, not only mentally and morally sound, but also trustworthy as experts, laborious, capable of inquisition, and not disqualified by confidence in anybody.

12*

The plaintiffs are an incorporated trustee, existing only in contemplation of law, and the action is brought on a bond given by the defendants in 1877 for the security of the trust fund. The plaintiffs, having no beneficial interest in any property, hold a mere legal title : the whole equitable estate is in the depositors. If the published reports of examinations made in previous years had induced the defendants to become depositors in 1877, and they claimed damages out of the trust fund in an action on the case against these plaintiffs for deceit, or in a distribution of the fund in insolvency proceedings (G. L., *c.* 166, *ss.* 9–17), other depositors would claim that the insufficient examinations were not made, reported, or published through any fault of any of the equitable owners of the fund, and that such owners had no more control of the election or action of the trustees, or the committee of trustees, in previous years, than the subsequent depositors or the treasurer's sureties had in 1877. A single unincorporated person carrying on the business of a depositary and savings-bank could be liable for deceit and fraud : but some of his depositors would contend that their property, held by him as a trust fund, and invested in his name as trustee, could no more be taken on execution to pay damages for a fraud committed by him on other depositors, than a ward's property similarly held and invested could be applied to pay the debts of his guardian. For the indemnification of persons defrauded by the plaintiffs' trustees, the plaintiffs have no property except the trust fund. To invalidate the treasurer's bond for fraud committed by trustees, is to make the fund answerable for the fraud. This cannot be done in behalf of the defendants without showing that in law the averments of thorough examinations were made by the plaintiffs, and that the plaintiffs were by law authorized to appropriate deposits in satisfaction of damage caused by representations that the examinations were thorough.

For some purposes the plaintiffs' depositors are stockholders of a bank. In some sense they are the plaintiffs, and the trustees are their agents. *Cogswell* v. *Bank*, 59 N. H. 43 ; *Hall* v. *Paris*, 59 N. H. 71. But the committee of trustees who made the examinations were not so far the agents of the depositors as to make the depositors personally liable as principals. The examinations were not, in every legal sense and for all legal purposes, the acts of the depositors. If these defendants claimed damages out of the trust fund for losses caused by the reported examinations inducing them to become depositors, they would need to show that the reports were, in law, representations made by these plaintiffs; that the reports were published on such occasions, or for such a purpose, that every reader had a legal right to rely upon them as representations made by the bank to induce deposits, and that the loss incurred by relying upon them was a damage for which some depositors should be indemnified out of the property of other depositors held in trust by the bank. If, after the reports were published,

and before the defendants became depositors, others had made deposits not on the faith of the reports, or had withdrawn their deposits, various questions might arise. There may be a question whether the statute requiring the plaintiffs to publish the reports of the examinations means anything more than that the trustees should cause them to be published at the plaintiffs' expense. And if the examining committee of three trustees, by false representations in their reports, had caused the defendants to suffer losses by becoming depositors, there may be a question whether the plaintiffs would be responsible for the fraud, and whether the defendants would be entitled to damages out of the trust fund.

Whatever personal liability of the committee or corporate liability of the plaintiffs might be claimed by those for whose benefit the examinations were made and reported, they were not made or reported by the committee, or published by the plaintiffs, for the purpose of inducing any one to sign the treasurer's bond, or with an understanding on the part of the committee or the plaintiffs that the publication would authorize any one to hold the plaintiffs responsible for his act of becoming a surety. If the defendants were discharged by the committee's fraud, the committee ought to be liable to the plaintiffs. The depositors should have security not inferior to the bond (Laws 1855, c. 1746, s. 5; G. L., c. 170, s. 7), for which a right of action against the committee might not be an equivalent. If any one of the defendants proposed to sign the bond on the faith of the committee's assertion of thorough examinations disclosing no embezzlement, and to hold the committee or the plaintiffs responsible for the statement, fair dealing required him to apply to the committee for the information on which he proposed to act, to let them know why he sought it, and give them an opportunity to exercise their right of declining to make any representation for which they or the bank could be accountable to him.

The committee's duty of diligent examination and truthful report was not due to persons considering the question of becoming sureties of the treasurer. It was a duty imposed by statute for the benefit of depositors, and not to enable a reader of the published reports to determine whether the treasurer was a man whose official bond he could safely sign. Publications ordered by the legislature for the protection of depositors the defendants seek to employ in depriving the depositors of protection. If the defendants had been induced by the reports to make deposits in the bank, they might have claimed that they were of a class whom the reports were intended to influence. The publication was for the information of the public, and to supply all with evidence which they might consider on the question of taking certain action. But the question of becoming a surety of the treasurer was not one for the decision of which the law compelled the reports to be made public as evidence furnished by the plaintiffs, with the consequence

of subjecting the trust fund to a great risk of losing the security of the bond. Whatever authority it might be claimed any of the plaintiffs' officers or managers had to accomplish or defeat the purpose of the statutory trust by performing the duty of publishing the results of the committee's examinations, the duty of publication was not imposed to aid the treasurer in obtaining sureties, or to clothe any one with a power of nullifying the statutory requirement of a bond. The doctrine of *Graves* v. *Lebanon N. Bank*, 10 Bush. 23, cannot be accepted as a discharge of these sureties without unreasonably imputing to the legislature an implied intention to expose the savings of depositors to unnecessary and unjust peril by authorizing the protective bond required by *s.* 7 of *c.* 170, Gen. Laws, to be destroyed by the protective publication required by *s.* 2 of the same chapter. There is no evidence that the reports were published, or were understood to be published, with any other object than the execution of the legislative command, the purpose of which did not establish between these parties the privity of representation necessary for this defence.

In *Lee* v. *Jones*, 17 C. B. N. S. 482, the contract, written by the plaintiffs and signed by the defendant, guaranteeing payments to be made to the plaintiffs by their commission agent, recited certain material facts, but concealed from the defendant the fact of an existing indebtedness of the agent to the plaintiffs. In this case, the examining committee neither concealed anything, nor had anything to conceal. They had no knowledge of any embezzlement or danger. The written statements of the bank's condition were the correct results of their examinations, and were true according to their best knowledge and belief, as they made oath. Their examinations being worthless, their best knowledge and belief were of no value. The only incorrect representation made by them in their reports was the statement that their examinations were thorough. Whether this was anything more than an expression of opinion it is not necessary to inquire. The want of privity is decisive.

*Judgment for the plaintiffs.*

STANLEY, J., did not sit: the others concurred.