## LAWRENCE *v.* TENNANT & *a.*

Where a document was offered in evidence purporting to be an ancient plot of a town, and an inspection of it, taken in connection with other evidence, established that it was what it purported to be—*Held*, that it was properly admitted.

Declarations of deceased persons as to the boundaries of their land, though not made upon the land, are admissible on an issue between parties not privy in estate to them, if the declarants had means of knowledge as to such boundaries and no apparent interest to misrepresent.

The former existence of a monument at a certain point, and the fact that the corner of a wall was placed by. A at the same point, being relevant to the issue, the report of a referee is not set aside because A and B, whose adjoining lands were bounded by the monument, were permitted to testify to a conversation between themselves, at the time the wall was being built, which tended to show that both then understood that the corner of the wall was located at the place of the former monument.

Declarations of deceased persons are admissible to prove the original location of a highway.

TRESPASS, *qu. cl.*, for cutting down and carrying away trees growing on the plaintiff's land in Epsom. Facts found by a referee. The defendants justified under one Steele, who was the owner of two "Home" lots lying adjacent to the plaintiff's land in the "Gore," so-called. The question was as to the true location of the line between the Home lots and the Gore, that being the line between the plaintiff's land and that of Steele.

The plaintiff was shown a plan which was marked "Plot of the town of Epsom, taken on a scale of 100 rods to an inch, July 2, 1800, D. L. Morril," and testified,—"That plan was given to my father by Dr. Sam. Morril, brother of Gov. Morril, who made it. We gave it to Nathan Griffin." Upon cross-examination he testified,—"Father told me Dr. Morril gave it to him. I saw this

plan when father was hoeing, when I was a young man; am now sixty-nine years old. When I first saw it, it was at our house. Nathan Griffin told me father gave it to him. Father used to have it with his surveying tools: father was a surveyor. Can't tell how long from first time to last time I saw it in father's possession. Father lived where I live—lived there till he died. Father died about 1858 "

George W. Lane, a surveyor, was shown this plan, and testified,—" I have seen Morril plan. I have had it, and handed it to one of plaintiff's counsel. I had it of Mr. John H. Dolbear, of Epsom, who wrote History of Epsom for County History. I had had this plan before this; the first time I went to survey these premises I had this plan with Master Nathan Griffin, an old surveyor; had it in 1884—October, I think. Upon this evidence, and subject to exception, the plan was ruled in.

At the point A on the plan hereto annexed was a stake and stones, agreed to be on the true line between the Gore and the Home lots. The plaintiff claimed that there had been a stake and stones at the north-westerly corner of the Gore, and that the corner of a wall shown the referee was over the place where this bound had been marked D, and that D A was a part of the disputed boundary line between the Gore and the Home lots.

David Griffin at one time owned the lot of land in the Gore indicated by the letters C O P J on the plan. After his death, his two sons, John and Nathan, divided this lot by the line B I. John Manson Griffin, a son of John Griffin, was permitted to state that his father and his uncle Nathan showed him the northerly end of the division line agreed upon by them, and stated to him that it was a point on the boundary line between the Gore and the Home lots.

Henry F. Sanborn owned a farm in the Gore, and Benjamin Towle owned adjacent land west and north of that farm, as indicated on the plan. Sanborn was permitted to state that his father and grandfather, who had owned the farm before him, told him that the end of a fence which formerly stood on the site of the present wall was the corner of the Gore lot and the original Sanborn farm; also, that the line of the Sanborn farm ran from six to eight rods north of certain buildings. He further testified that when he was at work building a short wall from D easterly, about twenty years ago, Benjamin Towle came up to the wall, looked at it, and remarked, " You have removed the bounds which the fathers set," and that he asked Towle in reply if he was not putting up as good a one as he was taking away.

Wm. F. Sanders was allowed to testify that Frederick Sanborn, the father of Henry F., told him that there was a stake and stones near a pair of bars, which was the corner of the Sanborn farm— the bound between the Home lots and Sanborn farm. It was not pointed out to the witness on the ground.

Benjamin Towle testified that the wall at the corner D was "supposed" to be on the line between the Sanborn land and the land owned by Towle to the north.   He also testified to the same effect as Sanborn, with reference to the remark made by him to Sanborn when the latter was building the wall, and Sanborn's reply.   He also testified that "The Sanborns acknowledged that D was the corner, so far as I ever knew;" and that his father, Benj. F. Towle, on one occasion, pointed out D to him as such corner, and told him the line leading therefrom was the line between the Home lots and the Gore.

Declarations of deceased persons were admitted to show the original location of a highway known as East street, upon which the Home lots were laid out.   All the above evidence was admitted, subject to the defendants' exception.

*Chase & Streeter*, for the defendants.  1. Morril's "plan" was improperly received.   The fact that a piece of paper or parchment is evidently old, mutilated, and dirty does not render it competent evidence of the information it purports to convey.   It will not be denied that this evidence is what is usually denominated hearsay. It has not the sanction of an oath in its support; it is not subject to the test of cross-examination; it has not the authenticity of an official document, nor does it purport to be official or authoritative in any sense.   It is merely marked, " Plot of the Town of Epsom, taken on a scale of 100 rods to an inch, July 2, 1800.   D. L. Morril."   The question therefore is, Does it fall within any recognized exception to the rule excluding hearsay evidence?   Is it competent, as a declaration of a deceased person, or as an ancient document?   If it is not thus competent, it was improperly received as, perhaps, the most important part of the plaintiff's evidence.

The theory under which ancient documents are sometimes admitted without proof of their original execution is, that, "although between strangers, they are of such a character as usually accompany transfers of title or acts of possession, and purport to form a part of actual transactions referring to coexisting subjects by which their truth may be tested, and there is deemed to be a presumption that they are not fabricated."   *Boston   Water   Power Co.* v. *Hanlon*, 132 Mass. 483, 484; 1 Gr. Ev., *ss.* 141, 570; 1 Stark. Ev. 305.   The presumption, therefore, that an ancient writing or document contains the truth and nothing but the truth, does not rest alone on the antiquity of the evidence.   Something more is necessary to render it admissible in the trial of either a public or a private right.   It must to some extent partake of the *res gestœ.* A mere private narrative alone, though ancient, raises no presumption of its truthfulness.   "Survey books of a manor, although ancient, unless signed by the tenants, or unless they appear to have been made at a court of survey, are not evidence; they are

mere private memorials." 1 Stark. Ev. 305. An ancient map or plan may be received in evidence to prove public boundaries, if it appear that it was an authorized survey. If it purport to be an authorized survey, or if it be proved *aliunde* to be official, and is produced from an appropriate place, as in *State* v. *Vale Mills*, 63 N. H. 4, there may be little doubt of its admissibility. But some evidence, derived either from an inspection of the document itself, or from the place of its deposit, or from some other source, must be adduced in support of its authenticity before it can be regarded as competent evidence of anything except its own existence and antiquity.

That it is old, and seems to be a plan of a particular town, drawn by somebody, and is found somewhere, has no legitimate tendency to show that it was an authorized survey, or that it was an original survey, or that it was not the result of a purely private enterprise. If, from an inspection of such a document, it cannot be ascertained what it was intended to be, whether a public or a private plan, whether based on an authorized or an unauthorized survey, the essential requirement of such evidence, that it must come from a proper place of deposit, cannot be determined; for it might as appropriately be found in one place as in another. The reason of this requirement is, that it tends to give credibility to the proposed evidence (*Gibson* v. *Poor*, 21 N. H. 440, 446), and is in some sense a substitute for the sanction of an oath. From the ascertained or admitted character of the document it may be easily inferred that its being found in a given place was reasonably to be expected, and that consequently there is some evidence of its credibility, which renders it admissible as evidence; or it may be inferred from the same source that its place of deposit was an unreasonable one, and that consequently there is no evidence of its credibility, which finding renders the proposed evidence inadmissible. The primary question, therefore, in such cases is, What does the document profess to be, or what is it shown to be? The answer to this question is the basis of the further inquiry, Was it found in such a place as such a document might reasonably be expected to be deposited in? And on the determination of this question the admissibility of the evidence depends. The reverse reasoning cannot apply. Its fallacy is apparent. To say that because a document is found in a particular place therefore it has a particular character, and because it has that particular character therefore it was found in a proper place, is unsatisfactory logic.

In *Gibson* v. *Poor*, 21 N. H. 440, an ancient plan of the town of Goffstown, purporting to have been made by Matthew Patten, was admitted in evidence. But before it was admitted, and as the first step towards its admission, it was proved by the town records that the proprietors of the town appointed Patten to make a survey of the town. This was some evidence that the plan in question was the authorized one, and as it was found where such an

authorized plan might be expected to be found (as the court held), it was admissible as evidence. In *Morse* v. *Emery*, 49 N. H. 239 (not fully reported), "original surveys" of "disinterested" men, "having a long and extensive acquaintance" with the lands, and "employed" to make the surveys, were allowed to be introduced as evidence.

It is believed that no case can be found, of any authoritative force, which militates against the position we have taken. *Adams* v. *Stanyan*, 24 N. H. 405; *Whitehouse* v. *Bickford*, 29 N. H. 471, 480; *Smith* v. *Forrest*, 49 N. H. 230, 239; *Drury* v. *Midland R. R.*, 127 Mass. 571, 579; *Noyes* v. *Ward*, 19 Conn. 250; *Boston* v. *Weymouth*, 4 Cush. 538, 542; *Regina* v. *Milton*, 1 Car. & K. 58; *State* v. *Vale Mills*, 63 N. H. 4; *Plummer* v. *Ossipee*, 59 N. H. 56, 57; *Hunnicutt* v. *Peyton*, 102 U. S. 333, 363.

Morril's "Plot" does not purport to be an official plan, nor does it appear from any source that it was the original survey of the town of Epsom. It does not appear to have ever been referred to in connection with acts of possession of lands in that town, or to have ever been resorted to for the purpose of defining the extent of titles. How did it happen to be made, or what was it made for, or what was Morril's motive in making it? The case furnishes no answer. On the ground of its being an ancient document, how can it be presumed that it is true, unless the presumption is based on the mere fact of its antiquity alone? It has not the sanction of any pretended authority, nor does it appear from any evidence in the case that Morril himself, even if he made it, regarded it as authentic. It is immaterial where such a paper is found, for, not having the semblance of authority about it, either public or private, it might reasonably be expected to be found anywhere.

2. Nathan Griffin was interested in having the boundary established at B rather than at the point where the plaintiff claims the true boundary is, and his declaration, if otherwise unobjectionable, should be rejected under the very reasonable rule laid down in *Smith* v. *Forrest*, 49 N. H. 230, 231, that the declarant "must have no interest to misrepresent." The declarations also of Frederick and Josiah Sanborn, in the testimony of Henry F. Sanborn and of William T. Sanders, were improperly received for substantially the same reason. The Sanborns were interested in having the bound where they said it was. *Wallace* v. *Goodall*, 18 N. H. 439, 452; *South Hampton* v. *Fowler*, 54 N. H. 197, 200; *Morrill* v. *Foster*, 33 N. H. 379, 386.

The testimony of William T. Sanders was the merest hearsay. It was a conversation occurring elsewhere, and Sanborn may have had in mind an entirely different locality and boundary from that which Sanders understood him to refer to. It was not the act of a deceased party in pointing out a boundary (such act being a fact), but a conversation, and was hearsay pure and simple. It was incompetent, liable to mislead, and the report should be set aside for this

reason. It will be noticed that Sanborn and Sanders were not at the place of the boundary at the time the conversation took place.

3. We cannot conceive how the talk between Henry F. Sanborn and Benjamin Towle, at the time the wall was built at D (related by both of them in their testimony), was competent. It is true the location of the point at D was an issue in dispute, but not the location or building of a stone wall in that vicinity. If the witnesses might testify where the point D was, and if they might recount in evidence the declarations of deceased persons as to the location of that boundary, they could not relate their own declarations, for reasons already discussed. The reason for the admission of such evidence, where the declarant is dead, is said to be grounded on necessity. 1 Gr. Ev., *s.* 127. But when the declarant is living, this reason does not exist; for he may be examined as to the facts, which is better evidence than his opinion without the facts. It is also difficult to see how this evidence can be held to be a part of the *res gestæ.* The building of the wall did not change or affect in any degree the true location of the point D. If the wall was not built on the line, the builder's opinion to the contrary would not make it the true line in this suit. If the corner of the wall was placed over the point where the stake and stones originally were, perhaps it would have been competent for the witnesses to state that fact, but not to testify that, at the time the wall was built, they told each other that the stake and stones were "the bounds which the fathers set," or, in effect, that they then and there made a declaration as to the boundary between the Gore lots and the Home lots, which should be conclusive in any suit that might arise between any parties. To allow living witnesses to manufacture legal evidence in this way would be a practical abolishment of the time-honored and necessary rule excluding hearsay evidence and confining witnesses to the statement of facts. As these witnesses were adjoining owners, they had undoubted authority to establish the line between them where they saw fit, and, if they agreed to it, to build the wall where they supposed the line was, but not to declare what the ancient boundary was, and afterwards testify to their mutual declarations in a suit between strangers to their title. *Shepherd* v. *Thompson,* 4 N. H. 213, 215; *Pike* v. *Hayes,* 14 N. H. 19; *Wallace* v. *Goodall,* 18 N. H. 439, 452; *Bartlett* v. *Young,* 63 N. H. 265.

4. Benjamin Towle also testified that "the wall at corner D was supposed to be built on the line between Sanborn farm and School lot," and that "the Sanborns acknowledged that D was the corner." What men, whether dead or alive, may have supposed, or guessed, or imagined, cannot be evidence of any other fact. Expert testimony of this character, it is believed, has never been received,— certainly not until the witness was qualified to give an opinion.

The "acknowledgment" of the Sanborns, on the authorities and principles before referred to, cannot bind the parties to this suit, and the testimony should have been rejected.

*Wm. L. Foster* and *H. G. Sargent*, for the plaintiff, to the point that the Morril plan was properly received in evidence, cited and commented on,—Gr. Ev., *ss.* 21, 102, 105, 139, 142–144, 570; Best Ev., *s.* 497, 499; Hist. Merrimack Co. 459: Steph. Dig. Ev., *arts.* 85, 88; *Rust* v. *Boston Mill Corp.*, 6 Pick. 158, 165; *Boston* v. *Richardson*, 13 Allen 146, 151; *Boston* v. *Weymouth*, 4 Cush. 538, 542; *Gibson* v. *Poor*, 21 N. H. 440, 445–447; *Adams* v. *Stanyan*, 24 N. H. 405; *Whitehouse* v. *Bickford*, 29 N. H. 471, 479, 480; *State* v. *Vale Mills*, 63 N. H. 4; *Winn* v. *Patterson*, 9 Pet. 663, 675.

That the decision of the referee, as to the authenticity and admissibility of the plan, is not open to revision by the court,—Best Ev., 216, 385; *Walker* v. *Curtis*, 116 Mass. 98, 101; *Rees* v. *Walters*, 3 M. & W. 528, 531; *Dole* v. *Johnson*, 50 N. H. 452, 459; *Goodwin* v. *Scott*, 61 N. H. 112.

As to declarations of deceased persons concerning private boundaries,—*Great Falls Co.* v. *Worster*, 15 N. H. 412, 437; *Adams* v. *Stanyan*, 24 N. H. 405, 410, 417; *Smith* v. *Headrick*, 93 N. C. 210; *Wood* v. *Willard*, 37 Vt. 377; *Sasser* v. *Herring*, 3 Dev. Law 342; 1 Gr. Ev., *s.* 145, *n.* 1; *Kinney* v. *Farnsworth*, 17 Conn. 355; *Morris* v. *Callanan*, 105 Mass. 129; *Boardman* v. *Reed*, 6 Pet. 328, 341; *Shepherd* v. *Thompson*, 4 N. H. 213; *Halstead* v. *Mullen*, 93 N. C. 252.

That declarations as to boundary may be received, though not made on the ground,—*Smith* v. *Forrest*, 49 N. H. 230, 237, 238; *Powers* v. *Silsby*, 41 Vt. 289; *Webb* v. *Richardson*, 42 Vt. 472–474.

That the testimony of Sanborn and Towle as to their conversation about the location of the corner of the wall was competent,—Steph. Dig. Ev., *art.* 9; *Railroad* v. *Fay*, 16 Ill. 558, 568; *Tenney* v. *Evans*, 14 N. H. 343, 349; *Sessions* v. *Little*, 9 N. H. 271; *Plumer* v. *French*, 22 N. H. 450; *Wiggin* v. *Plumer*, 31 N. H. 251, 267; *Ordway* v. *Sanders*, 58 N. H. 132; *Stevens* v. *Miles*, 142 Mass. 571; *Corinth* v. *Lincoln*, 34 Me. 310; *Noyes* v. *Ward*, 19 Conn. 250, 254–256, 259.

BLODGETT, J. 1. The true rule as to receiving documents, ancient or otherwise, in evidence is conceived to be this: The party offering the paper must make out a *prima facie* case for its reception; he must show that the paper is apparently as he contends. If he wholly fail to do this, the court should reject the paper; but if there be a reasonable probability established that the paper is what it purports to be, the question then becomes one for the jury, and the paper ought to go before them with proper instructions.

The real question affecting the consideration of such documents

with the tribunal before which they are offered is, whether they are genuine, and contain a true statement of what they purport to contain. If found to possess these requisites, there is no reason why they may not be read in evidence. *Gibson* v. *Poor*, 21 N. H. 446. In this case both of these requisites appear. An inspection of the plan leaves no doubt that it is an ancient and much worn document, and, taken in connection with the reported evidence, establishes a reasonable probability that it is what it is marked and purports to be, namely, " A plot of the town of Epsom, taken on a scale of one hundred rods to an inch, in the year 1800, by D. L. Morril." The antiquity and genuineness of the plan thus appearing, it was of course admissible if made by public authority; and if not so made, it was none the less admissible, there having been preliminary evidence of its correctness. Other grounds of admissibility need not be considered.

2. The declarations of John and Nathan Griffin, as testified to by John Manson Griffin, were competent. They had the means of knowledge, and not only had no apparent interest to misrepresent, but, as owners of the adjoining home lot as well as the one divided, the location by them of point B at the pile of stones could not have affected their interests in any way, since whatever was added to one lot by the line which they adopted would necessarily be taken from the other.

3. The declarations of Frederick and Josiah Sanborn, which appear in the testimony of Henry F. Sanborn and William T. Sanders, were not incompetent by reason of interest. These declarations related to the location of point D; and as the plaintiff's claim is that the northerly boundary of his land and of the Gore lot is a straight line from A to D, and that D is the north-westerly corner of the Sanborn farm, the ancient ownership and occupation of the premises around D were pertinent to the issue. The Sanborn farm had been owned and occupied by the witness Sanborn and his ancestors back to his great-grandfather, and the adjoining school lot had for many years been owned and occupied by the Towles. From this long continued ownership and occupation it is to be presumed that the Sanborns and the Towles knew the boundaries and corners between their respective lands (*Smith* v. *Forrest*, 49 N. H. 236, 237); and this being so, it is difficult to conceive how the defendants' contention can be true, and the declarations of the deceased Sanborns as to the location of their north-east corner be rejected on the ground that they were interested in having it where they told the witnesses it was, in view of the fact that the Towles, the only other parties interested at the time, not only agreed to, but insisted upon, the same point as their south-west corner. Both parties were content with the location of the corner; neither sought to enlarge or change his boundary or the boundaries of any other person : both were entirely disinterested, unless the mere fact that they were adjoining owners rendered them

interested. But if it did, the objection goes to the weight of the evidence merely, inasmuch as under the statutory changes in the law of evidence, by which all persons interested, and all parties, even, have become competent witnesses, there is no longer occasion to exclude the declarations of deceased real estate owners as to their boundaries, upon the assumption of *Shepherd* v. *Thompson*, 4 N. H. 213, 215, and other like cases, that it must be presumed to have been their interest to extend their boundaries.

Stated more fully, the case presented is this: A farm has been owned and occupied by four successive generations of Sanborns; and the farm adjoining it on the north has been owned and occupied by two successive generations of Towles. There is no evidence that the line between them has ever been in controversy or doubt. Their undisputed boundary is the western part of the line running from the point D eastward to A. Twenty years ago, Sanborn built a wall on that line in place of bounds described by Towle as " bounds which the fathers set up." When H. F. Sanborn is called as a witness in this case, he is interested in a sense that is apparently immaterial in giving testimony that will carry the boundary north to that line and beyond it, as Benjamin Towle is interested in carrying the same boundary south to that line and beyond it. But they are not interested in this suit; and if they were, they would not be disqualified as witnesses by their interest to misrepresent. The plaintiff introduced the testimony that their fathers, F. Sanborn and B. M. Towle, told them in substance that the line D A was the boundary. The declaration of B. M. Towle was in effect a disclaimer of title south of that line, and the declaration of F. Sanborn was in effect a disclaimer of title north of it; and to that extent their declarations come within the strictest interpretation of any rule that could require their statements to be against their interests. If they were admissible only as disclaimers, B. M. Towle's declaration would be evidence for the plaintiff in this case, but would not have been evidence for the defendant if the plaintiff had claimed that the boundary was north of D A. Such a rule, instead of admitting them because the declarants made them under circumstances calculated to elicit the truth, uninfluenced by interest in an existing controversy, would adopt as a test the subsequent interests of other persons in a controversy concerning the boundary of other lands—a controversy that might have arisen long after the declarant's decease. The true rule admits this traditionary evidence not as a mere disclaimer or disparagement of title, but on the broader ground of the nature and necessity of a class of cases in which great difficulty in proving original landmarks is likely to arise from lapse of time. The interests of F. Sanborn and B. M. Towle, as the respective owners of adjacent lots, the common boundary of which was unquestioned, showed a strong probability that they had knowledge of that boundary. B. M. Towle's statement that the line D A was his southern boundary was confessedly competent; and there is no

ground of reason for excluding F. Sanborn's concurring statement that the same line was his northern boundary. Had their statements been mere conflicting assertions of their claims in an existing contention, they might have been of no value. Instead of being expressions of their interests in a disputed boundary, or of their desires to enlarge their possessions, they tended to prove a common understanding, and to disprove all motive to misrepresent. Under such circumstances, the admission of Towle's statement and the rejection of Sanborn's, when the question is between D A and a line south of it, and the admission of Sanborn's and the rejection of Towle's when the question is between D A and a line north of it, would encumber the rules of evidence with an arbitrary discrimination, and unjustly suppress the cogent proof furnished by the concord of adjoining owners.

The further objection to the testimony of Sanders, because (1) the declaration of the deceased party was purely hearsay, and because (2) they were not made on the land and while pointing out the corner, is not well taken.

It is true that such evidence is hearsay in its nature, but it is equally true that it comes within a well recognized and long established exception to the general rule of law, that hearsay is not competent evidence; and while it may not often be entirely satisfactory and conclusive, it has been found to subserve the ends of justice, and its admissibility in this class of cases is well settled. As to the second ground of objection, it is sufficient to say that declarations, otherwise admissible, are not rendered inadmissible because made off the land, and because the object referred to was not pointed out. *Smith* v. *Forrest*, 49 N. H. 230, 237; *Powers* v. *Silsby*, 41 Vt. 288; *Webb* v. *Richardson*, 42 Vt. 472, 474.

4. The defendants contend that the jesting exclamations and remarks of Sanborn and Towle as to the removal of the landmarks or bounds were incompetent as declarations of living witnesses concerning the location of a corner bound. It is insisted, however, by the plaintiff's counsel (and such would seem to be the fact), that they were not introduced for that purpose, but for the purpose of showing that at the time the wall was built there was a stake and stones at D, and that the corner of the wall was placed upon that exact spot. The statement of these facts by the witnesses in a proper way would not have been objectionable. The location of the point D being in issue, the former existence of a stake and stones at the same place where the wall was subsequently built would be a relevant fact upon that issue. This was what the evidence excepted to tended to prove. In legal effect, the involuntary and coincident remarks of the witnesses to each other amounted simply to a mutual recognition of an established line between them, and that one kind of a bound was being substituted for another at the same place. Accompanying an act relevant and material independently of what was said, and serving to elucidate and give it a character, no reason is perceived why these remarks

might not properly be considered as a part of the *res gestœ* (see Steph. Dig. Ev., *art.* 9, and *Galena R. R. Co.* v. *Fay*, 16 Ill. 558, 568); but if not, they were at most but the statement of a relevant fact in an improper way, and, being cumulative testimony merely as to the undisputed Sanborn-Towle boundary, their admission does not afford a sufficient ground for setting aside the report of the referee.

5. The exception to the testimony of Benjamin Towle, that "the wall at corner D was *supposed* to be built on the line between the Sanborn farm and the school lot," is not well founded. The word "supposed," to which objection is made, was evidently used by the witness in the sense of understood, and when so taken is not open to valid exception. See *Leach* v. *Bancroft*, 61 N. H. 411. The further exception to the testimony of this witness, that "the Sanborns acknowledged that D was the corner, so far as I ever knew," cannot be sustained. See *Smith* v. *Forrest* and *Leach* v. *Bancroft, supra.*

6. The only remaining exception considered in the defendants' brief is to the admission of the declarations of deceased persons as to the location of the highway known as East street.

It appears from the reserved case that the defendants claimed that the highway as now occupied is the original East street, against which the Home lots were laid out; while the plaintiff claimed that the highway as now occupied is not the original East street, but that the street originally ran farther north five to eight rods from the present highway. The original location of the highway was therefore an important question upon the location of the southerly line of the Home lots, and being a matter of public and general interest, the evidence excepted to was competent. *State* v. *Vale Mills*, 63 N. H. 4; *Noyes* v. *Ward*, 19 Conn. 250, 269; 1 Gr. Ev., *ss.* 128–131. The exceptions are overruled.

*Judgment for the plaintiff on the report.*

CLARK, J., did not sit; DOE, C. J., and ALLEN, J., concurred; SMITH, J., concurred in the result; CARPENTER and BINGHAM, JJ., were of opinion that the declarations of Frederick and Josiah Sanborn, and those of Henry F. Sanborn and Benjamin Towle, were not competent evidence.