Merrimack }
Oct. 4, 1904. }

## SPEAD v. TOMLINSON.

An order of the trial court directing a verdict for the defendant upon one count of a declaration is conclusive against the plaintiff in a subsequent trial unless reversed, although there has been no formal entry of judgment thereon.

One who holds himself out as a Christian Science healer, and is employed to treat disease according to the methods adopted by such practitioners, is only required to possess the knowledge and to exercise the care and skill of the ordinary Christian Scientist.

The fact that directions given by a Christian Science healer to a patient deviated from the recognized rules of the medical profession in the treatment of similar cases is not sufficient to charge the former with negligence, in the absence of evidence that the course prescribed was in conflict with Christian Science practice.

In an action of malpractice against a Christian Science healer, it is incumbent upon the plaintiff to show that the defendant failed to conform to the methods ordinarily adopted by such practitioners in the treatment of the same disease ; and this burden is not sustained by proof of the defendant's statement that he could and would effect a cure, nor by evidence of a relation of trust and confidence between the parties.

In such action, the plaintiff is not entitled to recover on the ground that the practice of Christian Science is forbidden by public policy, when it appears that he knew the nature of his disease, was familiar with the treatment prescribed therefor by physicians of the regular school, was informed as to the means relied on by the defendant to effect a cure, and voluntarily employed the latter.

The statement by one professing the art of healing, that he can and will cure a person who applies to him for treatment, relates to a subject not susceptible of personal knowledge and is merely a strong expression of opinion.

If such a statement can be made the foundation of an action of deceit, it will be necessary for the plaintiff to produce some evidence tending to prove that the defendant did not entertain the opinion, before it can be found that it was expressed for a fraudulent purpose ; and the fact that the opinion is false and is regarded as absurd and irrational by the great majority of mankind has no such tendency.

CASE, to recover for damages alleged to have been suffered by the plaintiff at the hands of the defendant, who is a Christian Science healer. Transferred from the April term, 1902, of the superior court by *Peaslee,* J.

The declaration contains counts in contract, negligence, and deceit. Two trials were had in the superior court. At the first trial a verdict was ordered for the defendant upon the count in contract, subject to the plaintiff's exception. The case was submitted to the jury upon the other counts, and a disagreement resulted. The court refused to transfer the question raised by the exception to the direction of a verdict, and no bill of exceptions was filed. At the second trial the plaintiff excepted to the denial of a request for permission to introduce evidence upon the count in contract and to the direction of a verdict for the defendant upon the other counts.

In April, 1898, the plaintiff, who was then about fifty-five years old, suffered from an attack of appendicitis, employed a medical practitioner for several months, and learned in a general way the course pursued by physicians in the treatment of that disease. During the summer of 1899 she became interested in the doctrines of Christian Science, and attended meetings where the defendant told of wonderful cures he had performed. November 13, 1899, the plaintiff noticed symptoms similar to those which had ushered

in the previous attack of appendicitis, visited the defendant at his home, informed him of the nature of her trouble and her dread of a surgical operation, and employed him to treat her.   The defendant told her that a surgical operation was not necessary, that she was not to take any medicine, and that he could and would cure her if she continued his treatment.   He directed her to read " Science and Health," to continue her usual diet of solids, and to take her accustomed exercise.   He also read to her extracts from " Science and Health," and administered treatment by sitting in front of her in an attitude of prayer..

The plaintiff employed the defendant for several days, during which time her illness increased.   She finally placed herself in the hands of physicians, submitted to a surgical operation, and was cured.   There was evidence tending to show that the defendant's treatment was injurious to the plaintiff, and that if it had been persisted in a cure would have been impossible.

The plaintiff knew that the defendant made no claim to any knowledge of medicine and surgery, that he relied solely on the power of God to heal disease, and that his advice and treatment were contrary to what she would have received from a physician. She testified that she employed him because she believed he could cure her, and that her belief was based upon his representations as to the efficacy of his treatment in other cases.   She further testified that she did not doubt the sincerity of Christian Scientists, nor the sincerity of her own belief in their doctrines at the time she employed the defendant.

*Eastman & Hollis* and *Martin & Howe*, for the plaintiff.   We take the broad ground that a Christian Scientist who undertakes to cure the sick is bound to possess the skill and knowledge, and exercise the prudence, of the ordinary physician in like localities. If he fails to bring such skill and knowledge to the bedside of his patient, or, having such qualifications, fails to use such care as the ordinary physician would use under like circumstances, he must answer in damages for any injury arising from his incompetence.

In cases where the treatment is palpably bad, or opposed to the teachings of ordinary experience and common sense, the jury may find the defendant healer liable for damages without any expert evidence or enlightenment as to the proper and usual treatment. For instance, they may from their own knowledge hold a healer liable for amputating a finger to remove a wart, or prescribing Paris green for measles, or failing to remove the *placenta* after childbirth.   Such errors are *prima facie* negligence, and expert evidence is not necessary.   Shearm. & Red. Neg., *s.* 437; *Lynch v. Davis*, 12 How. Pr. 323.

When we pass from the field of common knowledge to cases where ordinary men would be in doubt, the jury must be aided by expert testimony. Such cases may involve the proper method of reducing a fracture, the necessity of amputation to save life, the choice of medicines, or the proper treatment for appendicitis. Here the jury may be aided by experts, and experts must be drawn from those who are qualified in the particular profession which handles cases of the kind under consideration. And since the expert in medical cases must testify for the enlightenment of the jury what the proper treatment is (*i. e.*, what he, a physician, would have done under the same circumstances), it is inevitable that the test should be the care, skill, and knowledge of the ordinary physician in like localities. It is then a question for the jury whether the defendant's care, skill, and knowledge was adequate to the task which he undertook.

The law is fixed and settled with respect to the civil and criminal liability of one who undertakes for compensation to heal the sick and alleviate human suffering. He is bound to have competent skill and knowledge to perform the task that he holds himself out to perform, and he is bound to treat his patients with care, attention, and assiduity. *Bibber* v. *Simpson*, 59 Me. 181; *Leighton* v. *Sargent*, 31 N. H. 119; *Commonwealth* v. *Thompson*, 6 Mass. 134; *Higgins* v. *McCabe*, 126 Mass. 13; *Commonwealth* v. *Pierce*, 138 Mass. 165; *Landon* v. *Humphrey*, 9 Conn. 209; *Carpenter* v. *Blake*, 60 Barb. 488; *McCandless* v. *McWha*, 22 Pa. St. 261; *State* v. *Hardister*, 38 Ark. 605; *Kuehn* v. *Wilson*, 13 Wis. 104; *Smothers* v. *Hanks*, 34 Ia. 286; *State* v. *Schulz*, 55 Ia. 628; *State* v. *Buswell*, 40 Neb. 158; *Rex* v. *Long*, 4 C. & P. 423; *Rex* v. *Spiller*, 5 C. & P. 333. Upon the foregoing authorities and the testimony in the case, it must be apparent that the defendant was guilty of negligence; for he had no skill and knowledge as to the proper treatment of disease, and he actually employed the exact reverse of the proper treatment. When absolute rest, a liquid diet, and hot applications were required, he compelled his patient to keep about her work, told her to eat anything, and not to use hot applications.

It may be contended that a physician or healer is required to use only the care, skill, and knowledge of his particular school of medicine. Thus, the allopath is measured by the allopathic standard, and the homœopath and the eclectic each by his own school. *Bowman* v. *Woods*, 1 G. Gr. 441. To this we make two replies: First, before this defence is available, it must appear from the evidence that the particular school to which the defendant belongs has rules and principles of practice in respect to the diagnosis and treatment of diseases, which each member is supposed to observe

in any given case. The evidence shows no such school of medicine in this case. *Carpenter* v. *Blake, supra; Nelson* v. *Harrington,* 72 Wis. 591; *Williams* v. *Poppleton,* 3 Or 139. Second, the treatment in this case was so contrary to reason and common sense that it was negligent *per se,* and there is no proof that the treatment is recognized by any school. *Leighton* v. *Sargent, supra; Lynch* v. *Davis, supra; Patten* v. *Wiggin,* 51 Me. 594.

In New Hampshire there are three schools of medicine recognized by statute, allopathic, homœopathic, and eclectic, each having a medical society of its own and each having a separate state board of medical examiners. Laws 1897, *c.* 63, *s.* 2. These statutory provisions are at least evidence from which the jury might find that there is no other recognized school of medicine in this state. Indeed, this conclusion is irresistible since there is no other evidence upon the point.

*Streeter & Hollis,* for the defendant.

BINGHAM, J. 1. Whether the verdict was properly directed for the defendant at the first trial upon the count in contract is not considered, as the question is not before us. At the time of the second trial the counts in negligence and deceit presented the only issues of fact that remained undisposed of; and while judgment had not been ordered upon the verdict directed upon the count in contract, it seems, as the case then stood, that there was no occasion for a trial of any issue of fact upon that count, and the record presents no error in the ruling of the court as to this matter.

2. In arguing the questions raised by the plaintiff's exception to the verdict directed upon the count in negligence, counsel discussed at some length the standard of care by which the defendant is to be judged. It was contended in behalf of the defendant that it was the care, skill, and knowledge of the ordinary Christian Scientist who undertakes to treat diseases according to the methods practised by such healers, while the plaintiff's counsel claimed that it was the care, skill, and knowledge of the ordinary physician.

The latter position is clearly untenable. The principle involved is not new. It has long been recognized as the law of this state that " a person who offers his services to the community generally, or to any individual, for employment in any professional capacity as a person of skill, contracts with his employer that he possesses that reasonable degree of learning, skill, and experience which is ordinarily regarded by the community, and by those conversant with that employment, as necessary and sufficient to qualify him

to engage in such business." *Leighton* v. *Sargent*, 27 N. H. 460, 469. The same principle governs the conduct of persons, other than professional men, who undertake duties requiring special qualifications. One employed to do work requiring skill upon a chattel is said to engage to use " that skill and diligence which prudent local workmen, of the same class, are wont to bestow upon similar undertakings." 1 Schoul. Bail., s. 104.

If, however, the employee is known not to possess the requisite skill, or is not called upon to exercise the particular art or employment to which he belongs, and he makes no pretension to skill in it, the law does not require that he should exercise the skill he is known not to possess, or the particular art or employment to which he does not belong and in which he does not pretend to be skilled. In such a case, if loss ensues because of his lack of the requisite knowledge and skill in the particular employment, it must be borne by the employer; for the employee under such circumstances is responsible only for a failure to reasonably exercise the skill which he possesses, or the judgment which he can employ. As is said in Story on Bailments (*s*. 435) : " If a person will knowingly employ a common matmaker to weave or embroider a fine carpet, he must impute the bad workmanship to his own folly. So, if a man who has a disorder of his eye should employ a farrier to cure the disease, and he should lose his sight by using the remedy prescribed in such cases for horses, he would certainly have no legal ground of complaint." And in cases involving the liability of medical practitioners, courts have held that "if there are distinct and differing schools of practice, as allopathic or old school, homœopathic, Thompsonian, hyropathic or water cure, and a physician of one of those schools is called in, his treatment is to be tested by the general doctrines of his school, and not by those of other schools." *Patten* v. *Wiggin*, 51 Me. 594; *Carpenter* v. *Blake*, 60 Barb. 488, 513, 514; *Bowman* v. *Woods*, 1 G. Gr. 441, 443; and cases cited in briefs of counsel.

In *Bowman* v. *Woods*, *supra*, which was an action against a botanic physician, who had attended the plaintiff at childbirth and had not removed the *placenta* for thirty-six hours after the accouchment, the defendant offered to prove that, according to the botanic system of practice in medicine, it was considered improper to remove the *placenta;* that it should be permitted to remain until expelled by efforts of nature. And it was held that such proof would be a defence; that " a person professing to follow one system of medical treatment cannot be expected by his employer to practice any other. While the regular physician is expected to follow the rules of the old school in the art of curing, the botanic physician must be equally expected to adhere to his

adopted method. . . . The law does not require a man to accomplish more than he undertakes, nor in a manner different from what he professes."

In the present case the evidence discloses that the plaintiff was suffering from an attack of appendicitis, and that the defendant, a Christian Scientist, who held himself out as competent to treat diseases, upon being applied to for treatment by the plaintiff, undertook for a reward to treat her. He told her, in substance, that her disease was curable without a surgical operation, that drugs and medicines should not be used, and that he could and would cure her if she would take the treatment. The plaintiff knew the treatment which the regular school of physicians would prescribe for appendicitis, and that the defendant was not a physician of that school and did not practice according to its methods, but was a Christian Scientist, and practiced according to the methods recognized by such healers.

Under these circumstances, a jury could not find that the defendant undertook to treat the plaintiff according to the methods of the regular school of physicians, or that he held himself out as possessing the knowledge and skill of the practitioners of that school. Such a finding would be contrary to what the evidence shows the parties understood, or could understand, at the time of entering into the contract; and the law will not imply an undertaking which a jury could not reasonably find from the evidence. Schoul. Bail., s. 105.

The plaintiff knew that she was not to be treated according to the methods of the regular school. Had she been an infant, *non compos*, or had never assented to Christian Science treatment, then the question whether the practice of Christian Science, as applied to the treatment of appendicitis, is so contrary to common sense and reason that it would be negligent for such a practitioner to undertake to treat the disease, might be open to consideration by a jury. But being a person of mature years, and having sought such treatment, she cannot now complain that the method itself was improper. What the parties mutually expected was that the defendant would treat the plaintiff according to Christian Science methods; and it necessarily follows that the defendant, in the treatment of the plaintiff, is to be judged by the standard of care, skill, and knowledge of the ordinary Christian Scientist, in so far as he confined himself to those methods.

3. Was there evidence tending to show that the defendant did not possess the knowledge and use the care and skill of the ordinary Christian Scientist, in the treatment of the plaintiff?

It has been held in cases where the medical profession recognizes but one course of treatment, that the adoption of any other

course might be evidence of a want of ordinary knowledge, care, and skill (*Patten* v. *Wiggin, supra; Howard* v. *Grover*, 28 Me. 97,—48 Am. Dec. 478, 483, note ; *Slater* v. *Baker*, 2 Wils. 359 ; and cases cited in briefs of counsel) ; and the plaintiff's contention is, that when the defendant told her to keep about the room the same as usual, to eat anything she wanted, not to lie down, and took hold of her and made her sit up when she was lying down, he deviated from the recognized methods of the practice and was negligent.

While there was testimony that no material means are employed or considered by Christian Scientists in the treatment of disease, there was no evidence that these directions interfered with Christian Science practice ; and we are of the opinion that a jury could not find from this evidence that the defendant deviated from the practice of the science, and that he did not possess the knowledge and use the care and skill of the ordinary Christian Scientist.

*Exception to the verdict upon the count in negligence overruled.*

CHASE and WALKER, JJ., did not sit: PARSONS, C. J., and REMICK, J., concurred.

After the filing of the foregoing opinion, upon the request of the parties they were further heard by brief and orally.

*Eastman & Hollis* and *Martin & Howe*, for the plaintiff.

1. The defendant says that the plaintiff was negligent because, knowing what the ordinary treatment was, she followed without question the directions of Tomlinson, when those directions were manifestly improper, judged by ordinary standards; or, to put it colloquially, she wanted Christian Science, and if she was foolish enough to accept that treatment, she must take the consequences. We admit that the plaintiff knew what the ordinary treatment was, that Tomlinson advised her directly contrary thereto, and that between persons who stand on an equal footing, where services are rendered gratuitously, this defence might be sound. But where the healer induces the patient by tales of wonderful cures performed and by a direct assurance that he can and will cure her malady if she will engage his services for hire, we submit that a position of trust and confidence exists which places him upon a distinctly higher plane in the matter of proper care, and relieves his patient of any duty to decide for herself whether his treatment is proper. It was not the duty of the plaintiff to inform herself as to the defendant's professional attainments, or to consider and weigh his method of treatment at every step. He assumed the

responsibility for the correctness of his methods when he offered his services, and she had a right to rely upon his. superior knowledge and skill. The principles of law on this subject apply equally to all classes of professional men. *Leighton* v. *Sargent*, 27 N. H. 460; *Logan* v. *Field*, 75 Mo. App. 594; *Dent* v. *Bennett*, 4 Myl. & C. 268; *Allen* v. *Davis*, 4 DeG. & S. 133; 7 Am. & Eng. Enc. Law 410, 426; 14 *Ib.* 70, 122.

With this relation of trust and confidence existing between the healer and his patient, it is manifestly unjust to say that the plaintiff is guilty of contributory negligence in following the instructions of the defendant. The plaintiff pays the defendant for his services, relying upon his superior knowledge and skill. If the plaintiff disobeys the defendant's instructions, he cannot recover for resulting injuries. If, then, the defendant assumes the responsibility by giving directions, can he escape liability by declaring that the plaintiff was negligent in following his instructions? Can a man by discrediting his own advice avoid the consequences of his acts?

Where the injury complained of is not mere inadvertence or lack of judgment, but a deliberate, aggressive invasion of the plaintiff's right of personal security, the doctrine of contributory negligence has no application. *Steinmetz* v. *Kelly*, 72 Ind. 442; *Salem* v. *Goller*, 76 Ind. 291; *Beem* v. *Chestnut*, 120 Ind. 390.

While we contend that a patient can never be held guilty of contributory negligence in following the instructions of his physician, the court need not in the present case go to that extent in setting aside the nonsuit; for if a patient may be held guilty of contributory negligence in obeying his physician under certain circumstances, it is at least the right of the present plaintiff to have the jury decide whether this is such a case. It was for a jury to say whether under all the circumstances a person of ordinary prudence would not have relied upon Tomlinson's mysterious "treatment" to avert the evil consequences of his visible treatment. The plaintiff knew that his treatment was contrary to the regular treatment, that he used no drugs or surgery, and that he claimed to cure by the power of God. How he brought the power of God to bear on her particular case she did not know; and when he assumed the responsibility to cure for hire, she had a right to rely upon his superior knowledge and follow his directions. It was, at least, for the jury to weigh all the circumstances,—his knowledge and her knowledge of the case, his knowledge and her knowledge of the treatment pursued, his knowledge of his secret method and her ignorance of that method; and upon these facts it was for the jury to say whether he and she used ordinary care. Was her knowledge so nearly equal to his that she was on an

even footing and hence guilty of contributory negligence? Were their relations such that she was bound, under all the circumstances, to be as careful and vigilant as the hired professional? Upon these questions it is certain that reasonable men might differ, and it follows that they should be left to the jury.

2. The defendant is precluded upon grounds of public policy from setting up the defence of contributory negligence. By "public policy" we mean "that principle of the law which holds that no one can lawfully do that which has a tendency to be injurious to the public, or against the public good." 23 Am. & Eng. Enc. Law 455. If it be considered against public policy to enforce contracts which contravene the health, morals, comfort, and welfare of the people, we see no reason why it should not be against public policy to permit a man, holding himself out as a healer, to interpose as a defence his own deficiency in his profession, so gross that it is contributory negligence to accept his services. If he can continue to treat patients in such reckless fashion without civil liability for his acts, the public are at his mercy and have no recourse.

This case stands as if one should sue a common carrier for negligence in failing to transport him safely according to agreement. If the carrier replies that the plaintiff knew he was habitually guilty of gross carelessness, and even signed a contract that the carrier should not be liable for negligence, the law steps in and says that such a contract is contrary to public policy and therefore void. If Tomlinson had procured the plaintiff to sign an agreement that he should not be liable civilly for gross carelessness, the court would have no difficulty in setting that agreement aside. In the absence of such an agreement, how can Tomlinson stand any better? *Nelson* v. *Harrington*, 72 Wis. 591; *Davis* v. *Beason*, 133 U. S. 333.

3. Tomlinson induced the plaintiff to hire him to cure her malady, by telling of wonderful cures he had performed and placing in her hands a book which stated the method employed to be the science of Christ. His treatment throughout gives evidence of trickery, fraud, and imposition. The claim that he could perform the miracles of Christ—that his method was the method of Christ—was enough of itself to warrant the jury in finding that he deceived the plaintiff. It was not necessary to prove that his claim was false. It is so ridiculous, so utterly opposed to sense and reason, that the jury might find it to be false from its inherent improbability. 14 Am. & Eng. Enc. Law 38, 70, 86, 95, 97; *Hedin* v. *Institute*, 62 Minn. 146.

Whether Tomlinson was guilty of fraud was solely for the jury, there being evidence which would amply support a verdict. *Sher-*

*wood* v. *Marwick*, 5 Me. 295; *Kendall* v. *Wilson*, 41 Vt. 567; *Gage* v. *Parker*, 25 Barb. 141; *Huntzinger* v. *Harper*, 44 Pa. St. 204. The question of fraud is peculiarly for the consideration of a jury; for when the facts of a case and the inferences to be drawn from those facts are once determined, reasonable men will decide with inevitable accuracy whether fraud was practiced or not. This is one question upon which we are all experts, for we are continually passing upon the motives and intentions of those persons with whom we deal in our daily life.

A fraud occurs when one person intentionally deceives another to his prejudice. Let us determine whether the case contains evidence upon which fair-minded men might properly find deception of this nature. In the first place, the plaintiff knew she was a victim of appendicitis, and she had been told that she must submit to an operation if she desired to get well. She dreaded an operation; she was casting about for some avenue of escape; she was in a weak, credulous condition, ready to snatch at any straw. The defendant was acting as a minister of the gospel, in a church, with its music and forms of worship. He was telling of wonderful cures he had made, and he was looking for patients and the money they would bring. The woman listened and believed, —foolishly perhaps,—but still she believed, gladly and implicitly. She tells him of her trouble. He says, " I can cure you and I will cure you." Again she believes, and pays him money. He puts in her hand a book, to be read as medicine, the text-book of his cult. He represents himself as a connecting link between suffering humanity and Almighty God. With such divine power, medicines and surgery are superfluous. Again she believes. She reads the book. It states in the opening paragraph that the founder of Christian Science discovered the science of Christ in the year 1866, and that God had granted to her a final revelation of the absolute principle of healing. It asserts that this system of the author has been submitted to the broadest practical tests, and has proved to be the most effective curative agent in medical practice. It solemnly avers that " colds, coughs, and contagion are engendered solely by mortal belief." It intimates that disease may be overthrown by argument, as an eloquent legislator would defeat an inhuman law. It declares that " man is never sick," and that tumors, cancers, and decayed lungs are figments of the imagination. The whole lesson of the book is that those who practice Christian Science can cure physical disease and suffering by mental means.

This is all so contrary to common sense and reason that a jury might well find every one of these assertions false. Since it is a fair inference that the book was put in the plaintiff's hands to

induce her to believe in the efficacy of Christian Science and continue further to employ the defendant, and as it appears affirmatively that the plaintiff, believing these assertions and relying upon their accuracy, actually employed the defendant, the jury might properly find that the defendant either knew them to be false, or gave them his sanction recklessly, without knowing whether they were true or not, and thus induced the plaintiff to hire him further. Can this court say as a matter of judicial knowledge, or from the evidence in the case, that the assertions of Tomlinson and the book are literally true? Can the court say that Tomlinson believed them himself, absurd as they are? Can the court say that he did not intend the plaintiff to believe them literally? Can the court say that the plaintiff lies when she says she relied upon them? Some one of these questions must be answered in the affirmative to take the case from the jury on the count in deceit. It will not do to say that the plaintiff ought not to have believed; for the more credulous a person may be, the more she requires the protection of the law. The point is, not whether she used due care not to be deceived, but whether the defendant, by his arts and devices, as a matter of fact deceived her.

We are not called upon to decide whether Christ could perform miracles; we have only to consider that this man, upon a fair view of the evidence, made the plaintiff believe that he had the power of Christ and could perform a miracle for her benefit. We insist that it is open to a jury to say that he failed to make good his claim in the present case, and there is no evidence that he ever performed a miracle or effected a cure. We say further that it is open to a jury to find that he lied wilfully and maliciously when he said he could perform a miracle by curing mentally, as Christ did. It must follow, if the plaintiff believed his representations, that whatever consent she gave to his acts did not relieve him from liability; for it is elementary that fraud vitiates consent. It seems to us too plain for argument that a man is guilty of actionable deceit when he lulls suspicion by assuming the cloak of religion. makes a positive assertion that he has the best curative agent on earth, persuades a suffering woman to believe it, asserts positively that he can cure her disease, and then treats her with such carelessness and ignorance that she grows steadily worse and would never have recovered if his treatment had been persisted in. At least, it must be conceded that a fair-minded jury might properly consider it in that light.

*Streeter & Hollis*, for the defendant.

YOUNG, J. 1. There was no evidence from which it could be found that the plaintiff employed the defendant to advise her as

to whether or not Christian Science could be successfully employed in the treatment of appendicitis, or to do anything except to treat her by that method. Under these circumstances, if she could legally employ him to give her such treatment, the duty the law imposed on him for her benefit was that of treating her as the ordinary man who treats the disease in that way would have done; for when persons are brought together by virtue of a contract, as doctor and patient, or lawyer and client, the duty the law imposes on the doctor for the benefit of his patient, and on the lawyer for the benefit of his client, and in general on the person who undertakes to do anything for the benefit of his employer, is that of using ordinary care to do what he has agreed to do in the way he agreed to do it. The reason for this is obvious. If there are different legal methods of treating a disease, or of doing any other work, the employer has the right to decide which method shall be used in his case. When a person has contracted to do a piece of work in a particular way, he is legally bound to do it in that way; so the duty the law imposes on him for his employer's benefit is that of using ordinary care in doing the work by the agreed method.

The test of the defendant's negligence is whether in his treatment of the plaintiff he failed to do anything which the ordinary man who treats appendicitis by Christian Science methods would have done. Evidence to be relevant to that issue must tend to prove that he did something which such a man would not have done. The plaintiff's claim, that the defendant's statement that he could and would cure her is such evidence, cannot be sustained; for it is not a matter of common knowledge that Christian Science healers are not accustomed to encourage their patients by assuring them they can and will cure them, nor was there any evidence that such was not the fact. Neither is it enough to entitle the plaintiff to go to the jury, in the absence of other evidence tending to prove that the defendant was negligent, to show that a relation of trust existed between the parties. The fact that he was her pastor and physician, at the time he gave her the treatment, has no tendency to prove how he treated her. It is clear she cannot prove that he failed to do what he ought to have done, without showing what he actually did.

2. By "public policy" is intended the policy of the state as evidenced by its laws. When the issue is its policy in respect to any question, the only matters which can be considered are its constitution and statutes and the provisions of the common law as evidenced by the decisions of the courts; for the common law, modified by the constitution and statutes of the state, is the law of the state. *Vidal* v. *Girard,* 2 How. 127, 197; *Hollis* v. *Sem-*

*inary*, 95 N. Y. 166, 171; *People* v. *Hawkins*, 157 N. Y. 1, 12; *Consumers' Oil Co.* v. *Nunnemaker*, 142 Ind. 560,—51 Am. St. Rep. 193, 196; *Richardson* v. *Mellish*, 2 Bing. 229.

Since nothing is opposed to public policy which is not forbidden by some provision of law, the contention that it would be contrary to sound public policy to permit the defendant to escape without paying damages must mean that there is some provision of our constitution, or statutes, or of the common law, which made it illegal for the defendant to rely solely on prayer to heal the plaintiff when he knew she had chronic appendicitis, and which gives her an action to recover all the damages she sustained because of such reliance. The court are not authorized to allow an action against the defendant, even if they think he ought to have known that Christian Science must fail when applied to the treatment of chronic appendicitis, unless there is a general rule of law which gives such an action.

If the plaintiff is to recover on the ground of public policy, she must establish (1) that it was illegal for the defendant to give her such treatment, (2) that the duty of not giving it was imposed on him for her benefit, and (3) that no illegal act of hers contributed to cause her injuries. It is the general rule that the plaintiff in an action sounding in negligence must show that the defendant failed to perform a duty owed him, and that his own failure to perform a duty owed the defendant did not contribute to cause his injury; in other words, he must show the defendant's fault and his own freedom from fault. Assuming (without deciding) that such treatment is forbidden by the provisions of section 8, chapter 278, Public Statutes, which makes the killing of a human being by culpable negligence manslaughter, or by the provision of the common law which makes it unlawful for any one to do what is liable to endanger the life or health of others (*Goodyear* v. *Brown*, 155 Pa. St. 514,—35 Am. St. Rep. 903, 907), and that the duty of not doing what is forbidden by either provision was imposed on the defendant for the plaintiff's benefit, the question still remains whether the plaintiff's own wrong contributed to cause her injuries. It is elementary that if it was illegal for the defendant to treat the plaintiff as he did, it was equally illegal for her either knowingly to employ him to give her such treatment, or to consent to be so treated. So far as the evidence goes, her knowledge in respect to the disease from which she was suffering and the treatment prescribed for it by regular physicians in good standing, and in respect to the way the defendant proposed to treat her, was at least equal to his.

It does not follow, as a matter of law, from the fact that the plaintiff cannot recover in this action on the count in negligence,

that the defendant would not have been guilty of manslaughter if the plaintiff had died from the effects of his treatment. If he had been indicted under the provisions of section 8, chapter 278, Public Statutes, the state would base its right of action on his failure to perform a duty the law imposed on him for its benefit. The state has a direct interest in the lives and health of all its citizens. Every one who has to do with the lives and health of others not only owes the individuals with whom he comes in contact a legal duty, but also owes the state the duty of using ordinary care to do nothing which will endanger their lives or health. In an action by the state, it would be no answer to show that if the deceased had used ordinary care to avoid being injured he would not have died; for the defendant is not indicted for his failure to perform a duty the law imposed on him for the deceased's benefit, but for his failure to perform one imposed on him for the benefit of the state. It is no more an answer in such an action to show that, notwithstanding the defendant's fault, death would not have resulted if the deceased had used ordinary care to avoid being injured, than it would be in an action against one of two joint tort-feasors to show that, notwithstanding the defendant's negligence, the plaintiff would not have been injured if the other had done his duty. *State* v. *Center*, 35 Vt. 378; *Commonwealth* v. *Collberg*, 119 Mass. 350; *Commonwealth* v. *Pierce*, 138 Mass. 165; *State* v. *Hardister*, 38 Ark. 605,—42 Am. Rep. 5; *Rex* v. *Walker*, 1 C. & P. 320; *Rex* v. *Long*, 4 C. & P. 423. The conclusion that the plaintiff's intelligent and voluntary consent to follow the defendant's advice and abide the result of his prayers is an answer to her claim for damages on the count in negligence, previously announced, is reaffirmed.

3. The sufficiency of the defendant's statement, as evidence of an unperformed contract to cure the plaintiff, is not before the court. Hence, since she cannot recover on the count for negligence, the only question remaining is whether she can recover on the count in deceit, for the defendant's statement that he could and would cure her. In such an action the plaintiff must allege and prove, not only that the representation was false, but also that it was made with a fraudulent intent. *Lord* v. *Colley*, 6 N. H. 99, 102; *Hoitt* v. *Holcomb*, 23 N. H. 535, 552; *Bedell* v. *Stevens*, 28 N. H. 118, 124; *Mahurin* v. *Harding*, 28 N. H. 128, 131, 132; *Gage* v. *Gage*, 29 N. H. 533, 543; *Hanson* v. *Edgerly*, 29 N. H. 343, 357; *Page* v. *Parker*, 40 N. H. 47, 69; *Pettigrew* v. *Chellis*, 41 N. H. 95, 99; *Griswold* v. *Sabin*, 51 N. H. 167, 170; *Springfield* v. *Drake*, 58 N. H. 19; *Messer* v. *Smith*, 59 N. H. 41; *Rowell* v. *Chase*, 61 N. H. 135; *Stewart* v. *Stearns*, 63 N. H. 99; *Ashuelot Bank* v. *Albee*, 63 N. H. 152; *Syracuse Knitting Co.* v.

*Blanchard*, 69 N. H. 447; *Cross* v. *Peters*, 1 Me. 376,—10 Am.
Dec. 78, 85; *Nash* v. *Company*, 163 Mass. 574; *Upton* v. *Vail*,
6 Johns. 181; *Kountze* v. *Kennedy*, 147 N. Y. 124; *Cowley* v.
*Smyth*, 46 N. J. Law 380,—50 Am. Rep. 432; *Lord* v. *Goddard*,
13 How. 198; *Pasley* v. *Freeman*, 3 D. & E. 51; *Haycraft* v.
*Creasy*, 2 East 92; *Derry* v. *Peek*, 14 App. Cas. 337.

The intent with which an act is done is to be proved, like other
facts, by the weight of competent testimony; but when the repre-
sentation relates to a matter which is susceptible of personal
knowledge, and is made as of the maker's own knowledge, the
jury may find from the fact that it is false, that it was made with
a fraudulent intent. A positive statement of that kind not only
includes a representation that the fact is as stated, but also the
further representation that the maker knows it to be so. When-
ever a person makes such a statement, the jury may find from the
fact that it is untrue, that it was made with a fraudulent intent.
If the maker was acquainted with the facts, he knew the state-
ment to be false when he made it. If he was unacquainted with
the facts, he knew the representation that he was acquainted with
them to be false. In the one case the fraud consists in stating
what one knows to be untrue; in the other, in representing that
he has knowledge upon a subject in respect to which he is
ignorant. It can be found from such evidence that the repre-
sentation was made with fraudulent intent if it was made to
induce another to act; for a representation which the maker
knows is untrue is made with a fraudulent intent when it is made
to induce another to change his position. *Syracuse Knitting Co.* v.
*Blanchard*, 69 N. H. 447, 449; *Pasley* v. *Freeman*, 3 D. & E. 51.

When a representation relates to a matter not susceptible of
personal knowledge, it cannot be considered as anything more than
a strong expression of opinion, notwithstanding it is made posi-
tively and as of the maker's own knowledge. The mere fact that
it is stated positively cannot make it a statement of fact. The
most any one can do as to such matters is to express his opinion.
It cannot be found, from the single fact that such a statement is
untrue, that it was made with fraudulent intent; there must also
be evidence that the maker knew it was in some respect untrue,
before there is anything to submit to the jury. *Page* v. *Bent*, 2
Met. 371; *Nash* v. *Company*, 163 Mass. 574; *Marsh* v. *Falker*, 40
N. Y. 562; *Kountze* v. *Kennedy*, 147 N. Y. 124; *Cowley* v. *Smyth*,
46 N. J. Law 380; *Haycraft* v. *Creasy*, 2 East 92.

It follows that a representation cannot be the foundation of an
action of deceit unless it contains a statement of fact in respect to
which the maker could have personal knowledge; for unless it
does, it contains nothing in relation to which he could state what

he actually knew to be untrue. When a person gives his opinion, the statement that it is his opinion includes one that he believes what he has said to be the truth; in other words, that what he has stated as his opinion is his opinion. Every expression of opinion contains at least that one statement of fact; consequently, a person can state what he knows to be false, for the purpose of inducing another to change his position, when he pretends to express his opinion as to any matter, as well as when he pretends to state facts in relation to it. In such a case the falsity of the statement consists in stating something as his opinion which is not his opinion.

If it is conceded that an action of deceit may be founded upon a mere expression of opinion (a question which it is unnecessary to decide in this case and upon which no opinion is expressed), it will be necessary, when the opinion relates to a matter upon which no one can have personal knowledge, to introduce some evidence from which it can be found that the person who gave the opinion did not in fact entertain it. The statement that it was his opinion would be the only statement of fact the opinion contained, and the only matter in respect to which he could state what he knew to be false. It cannot be found that he did not entertain such an opinion, from the mere fact that the jury are convinced that it is unsound. The reason for this is obvious. It is a matter of common knowledge that men frequently change their opinions. Few can recall the views held at different periods in life, in reference to any matter incapable of exact proof, without a feeling of surprise at the number of times they have changed their minds in regard to it. Neither is the seeming absurdity of a belief alone evidence from which it can be found that a person does not entertain it. We all know that honest men frequently entertain opinions which seem utterly absurd to the majority of their fellow-men. Common experience teaches that men ordinarily tell the truth, even when they say they believe things which seem absurd; so the fact that a person states something which appears absurd, or even incapable of belief, is at least as consistent with the view that it is his belief, as it is with the view that he is lying. Hence the fact of its seeming absurdity, in and of itself, has no tendency to prove he does not entertain such a belief. *Darling* v. *Westmoreland*, 52 N. H. 401; *State* v. *Lapage*, 57 N. H. 245; *Lawrence* v. *Tennant*, 64 N. H. 532, 540; *Nutter* v. *Tucker*, 67 N. H. 185; *Deschenes* v. *Railroad*, 69 N. H. 285. We have only to consider common superstitions to be convinced of the falsity of any other view. For example, it is not unusual to hear persons unskilled in meteorology say when they see the new moon that we shall have a wet month or a dry month, according to the moon's position in

relation to the earth, or that we shall have unseasonable weather during the year if the weather is unseasonable at Christmas. Notwithstanding the jury could find such statements are absurd, no one would think the jury could infer from the single fact that they were convinced of their absurdity that such persons in making such statements were lying; but if there was evidence that the persons making these statements were educated meteorologists, or that they believed weather conditions to be due to other causes, and it appeared that these statements were made with the intent that they should be acted upon, the jury could find they were not made in good faith.

Assuming that the defendant's statement, that he could and would cure the plaintiff, may be the foundation of an action of deceit, her case fails, for there was no evidence that he made it with a fraudulent intent. Although a jury could find from their knowledge of human affairs, their own experience, and the evidence in the case, that the defendant's statement that he could cure the plaintiff without the aid of any material agency, when he knew she had appendicitis, was untrue, it does not follow that they could infer, from the single fact that they were convinced of its untruth, that the defendant did not believe he could induce God to heal her when he made the statement. The evidence tended to prove that both parties believed there was no such thing as physical pain, and that those sufficiently proficient in the metaphysics of Christian Science could induce God to heal all manner of diseases through the agency of prayer. In short, the healing of disease by the prayers of the faithful was a part of their religious belief. It is a matter of common knowledge that honest men not only have in the past, but do now, entertain religious beliefs which appear to the great majority of their fellow-men both unsound and incapable of belief. So even if a relation of trust existed between the parties when the plaintiff employed the defendant to give her Christian Science treatment, a jury could not find, from the single fact that they were convinced the religious views both parties professed to entertain were absurd, that the defendant did not entertain them. There was no evidence that the defendant had any knowledge of physiology or medicine, or, aside from the plaintiff's statement to him of the fact (if it were a fact), that the plaintiff could have relief only through a surgical operation. If, in the absence of any evidence, such knowledge on his part could be inferred as part of the general knowledge of mankind upon the subject, such inference cannot be made in this case in the face of the direct and uncontradicted evidence of his belief as to the most effectual remedy for the relief of physical pain. Neither was there any evidence that he did not believe he could induce God to

heal her at the time he made the statement. The evidence tended to show that a very large number of people believe, in substance and effect, that Christian Science is the most effective curative agency known, and that it may be successfully applied to the treatment of all manner of diseases which afflict mankind. The sincerity with which this belief is held was conceded by the plaintiff in her testimony. She offered no evidence tending to show that the defendant did not in all sincerity entertain this belief.

If she had offered evidence that Christian Science treatment had never been successfully applied, or that no attempt had ever been made to apply it, to the treatment of chronic appendicitis, or that the defendant had never applied such treatment to any disease or to that disease with success, or had never known of such a case being successfully so treated, there would have been evidence of negligence in the defendant's attempt to treat her in the way he did and in the advice which he gave her, or it could be found that he intended to deceive her; for there would then have been direct evidence that he told her as a fact what he did not know to be true.

It is clear that the plaintiff cannot stand upon the universal experience of mankind, to be found by the jury from their knowledge of human affairs, when her undisputed evidence and her own admissions tend to establish that a very large number of people honestly entertain the views which she contends are unsound and absurd. Whether the defendant exercised ordinary care and was honest, were questions vital to the plaintiff's case. Her admission of his sincerity does not tend to prove either proposition. Neither can the plaintiff justly complain that the defendant is not compelled to prove as matter of defence the existence of a system of Christian Science treatment applicable to her case, when her own evidence admits the existence of such a system, and the belief in and practice of it in all diseases by a large number of people. The plaintiff fails because of the insufficiency of her evidence to prove the facts necessary to maintain her case.

*Exceptions overruled.*

CHASE and WALKER, JJ., did not sit: PARSONS, C. J., and BINGHAM, J., concurred.